62 N.J. Super. 15 (1960)
161 A.2d 747
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHRIS GLEITSMANN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 1960.
Decided June 14, 1960.
*18 Before Judges GAULKIN, SULLIVAN and FOLEY.
Mr. Abraham J. Slurzberg argued the cause for the defendant-appellant (Mr. Abraham Miller, attorney).
Mr. John J. Bergin, Deputy Attorney General, argued the cause for the plaintiff-respondent (Mr. David D. Furman, Attorney General).
The opinion of the court was delivered by GAULKIN, J.A.D.
Defendant, a captain of detectives in the West New York police department, was convicted of misconduct in office and he appeals.
The indictment was in two counts. Defendant had moved before trial to dismiss both counts "on the ground that the indictment does not allege a crime." The trial court denied the motion as to the first count but granted it as to the second, not on the ground that it did not state a crime but because it was "repetitious" of the first count and "surplusage." The State appealed the dismissal of the second count, but the defendant did not cross-appeal the refusal to dismiss the first count. We reversed the dismissal of the second count, in State v. Gleitsmann, 54 N.J. Super. 355 (App. Div. 1959). At the trial, at the end of the State's *19 case the State itself moved to dismiss the second count as "duplicitous and repetitious," contrary to the position it had previously taken (see 54 N.J. Super., at pages 360-361) and the motion was granted.
Defendant's first argument in the present appeal is that the first count of the indictment, upon which he was convicted, "should have been dismissed as it is palpably defective in that it fails to state facts sufficient to constitute a crime * * *." The indictment was quoted at length in State v. Gleitsmann, supra, at pages 357-358, so there is no need to repeat it here.
In the former appeal we pointed out (at page 361) that defendant "supports the action of the trial court permitting the first count to remain * * *." The State now contends that since defendant thus conceded the sufficiency of the first count, and its validity was necessarily approved by this court in the previous case, defendant may not now attack it. We find it unnecessary to express any opinion upon whether defendant has lost his right to attack the first count, because we find it to be sufficient in law. State v. Cohen, 32 N.J. 1 (1960); State v. Williamson, 54 N.J. Super. 170 (App. Div. 1959), affirmed 31 N.J. 16 (1959); State v. Kollarik, 22 N.J. 558 (1956); State v. Winne, 12 N.J. 152 (1953); State v. Weleck, 10 N.J. 355 (1952); cf. Ward v. Keenan, 3 N.J. 298 (1949).
The only argument in support of the attack upon the indictment that may not be fully answered by the cases cited above is that the use of a municipal telephone and police car for "personal and private affairs" by a police officer is not, standing alone, criminal. Defendant contends that (1) improper or immoral acts of a public officer, not made "a criminal offense by specific legislative enactment," do not constitute misconduct in office, and (2) even if we should hold they may, the "facts which characterize the acts and render them criminal" must be specifically alleged in the indictment, and since no such facts are set forth in the first count, that count did not charge a crime.
*20 As we read defendant's brief he does not contest the existence of the duty of a public official to refrain from using public property for private purposes but urges that "[t]he precise nature of this public duty is not delineated in the indictment and can not be determined by reference to any reported statute or case law." The standard, says defendant, is therefore only a moral one, and, as such it "violates the principle of due process of law requiring reasonable certainty of description in fixing a standard for exacting obedience from a person in advance of criminal prosecution. The administration of criminal justice can not rest on shifting, vague, and indeterminate standards subject only to the whims of those charged with the duties of prosecution and dependent on the varying impressions of the members of a court." Defendant quotes from Justice Wachenfeld's dissenting opinion in State v. Winne, supra, that "[c]riminal law is not co-extensive with morality." 12 N.J., at page 183. We may add that we are mindful of Chief Justice Weintraub's warning against the creation of "a tyranny of vagueness" by prosecutions predicated upon duties which arise from moral principles. State v. Cohen, supra.
Granting the correctness in principle of these general statements, we find they have no application here. The courts have prevented the common-law crime of misconduct in office from becoming a means for oppressive prosecutions premised upon vague moral principles by making willfulness an element of the crime. Willfulness, a term which may have different meanings in different contexts, means in the context of malfeasance arising out of breach of a duty of public concern "an evil purpose or mental culpability," a concept which is often labelled "criminal intent," "guilty knowledge," "mens rea," "bad purpose" or "corruption." State v. Williamson, supra, 54 N.J. Super., at pages 182-185; Morissette v. United States, 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288, 295 (1952); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. *21 1495 (1945); cf. People v. Harby, 51 Cal. App.2d 759, 125 P.2d 874 (D. Ct. App. 1942). As this court said in Williamson, supra, 54 N.J. Super., at page 185, "[t]he defendant's conduct is described [in the indictment] * * * as having been done `unlawfully and willfully,' which imports bad faith. State v. Winne, supra (12 N.J., at page 175). This is sufficient."
In State v. Kollarik, supra, the indictment alleged that Kollarik, a councilman charged with the public duty "to refrain from using public employees for his own private work at public expense * * * nevertheless * * * unlawfully and willfully did fail, omit and neglect the public duty of refraining from using public employees for his own private work at the public expense; contrary to the provisions of N.J.S. 2A:85-1 * * *." Upon evidence that Kollarik had a city employee paint screens and windows of his house, the court charged the jury
"* * * Certain officers have certain duties that just arise out of the nature of that office and the Courts may take judicial notice of such duties * * * by judicial notice I charge you that as Councilman of the City of Garfield he was under a duty not to use City employees at public expense, while they are on the City pay roll and being paid by the City, to do any private work for him on his own house * * *"
Kollarik was convicted of misconduct in office, and the conviction was affirmed. We see no difference in principle between that case and this.
For the foregoing reasons we hold that the first count of the indictment charges the crime of misconduct in office.
Defendant contends that his motion for acquittal at the end of the State's case should have been granted. When the State rested, the proofs were as follows.
Trooper Leibe of the New York State Police testified that on October 18, 1956, while stationed in Binghamton, New York, he arrested Carmine Galente for speeding, driving while his license was revoked, and unauthorized use of another's license; and that when the case was finally tried *22 Galente pleaded guilty and was sentenced to a total of $150 in fines, 30 days in jail, and an additional 30 days' jail sentence which was suspended.
Sergeant Edgar D. Croswell of the New York State Police, assigned to the Bureau of Criminal Investigation, testified that on October 18, 1956 he and Trooper Leibe questioned Carmine Galente at the police substation in Binghamton. On October 26, 1956 Sergeant Croswell received a phone call from a person who identified himself as Captain Gleitsmann of the West New York Police Department. This person said that he wanted to meet with Sergeant Croswell and discuss a "very" important case with him. When Sergeant Croswell asked what case it was, the person replied that he did not want to discuss it over the telephone. It was agreed that the meeting would take place at the Binghamton substation at 11:00 A.M. on the following morning, October 27, 1956. The meeting took place at the appointed time and place. Also present at the meeting were Detective Sergeant Peter Policastro of the West New York Police Department and Trooper Vincent Vasisko of the New York State Police.
Captain Gleitsmann showed his police badge and introduced himself as the person who had called Sergeant Croswell the day before. Captain Gleitsmann then said that he was there on behalf of Carmine Galente, and that he had been sent there by the Police Commissioner of West New York. Captain Gleitsmann said that the commissioner, at the request of a friend, wanted to save Galente from being sent to jail on the traffic violations.
Sergeant Croswell then showed Galente's criminal record to Captain Gleitsmann. After reading the record, Captain Gleitsmann commented that he didn't realize that Galente had such a record and that Galente was "a real bum." Sergeant Croswell then asked him why he interceded for such a person, and Captain Gleitsmann replied that he had no choice because he was sent up by the police commissioner. Captain *23 Gleitsmann told Sergeant Croswell several times thereafter that if "arrangements" could be made so that Galente would pay the maximum fine but escape a jail sentence, there would be a "consideration" in it for Sergeant Croswell and Trooper Vasisko.
When "it was all over," and Captain Gleitsmann was getting ready to leave, Sergeant Croswell asked Captain Gleitsmann how much "they" had sent him up with to make the deal. Captain Gleitsmann held up one finger. Sergeant Croswell asked: "do you mean a thousand * * *," and Captain Gleitsmann "shook his head yes." Trooper Vasisko testified that at this juncture Captain Gleitsmann said: "Do you think I am kidding?," and, pulling out a roll of bills, he said that "if that wouldn't be enough, let me use your phone."
Trooper Vasisko also testified that when he arrived at the substation, he saw a dark colored Ford with whip antenna and New Jersey license plates standing in front of the substation.
Allen J. Hanley, a certified shorthand reporter, was called as a witness to read certain testimony of Captain Gleitsmann given before the New Jersey Law Enforcement Council on October 21, 1957. In this testimony Captain Gleitsmann admitted that he made the telephone call to Binghamton from the West New York Detective Bureau and that he went to Binghamton in the West New York police car assigned to him.
Defendant argues that his motion for acquittal should have been granted because when the State rested it had failed to prove (1) "that defendant was on assigned duty" when the telephone call was made and the car driven to Binghamton, (2) that the call had been made on the town telephone or that the car belonged to West New York, (3) that the use of the telephone and the car by the defendant was contrary to "public duty," (4) that the call and the use of the car was for defendant's personal affairs and not connected with any matter pertinent to his assignment, *24 and (5) that defendant made the call and used the car willfully and with criminal intent.
Proof of (1) was not necessary. State v. Kollarik, supra; State v. Cohen, supra. In People v. Harby, supra, a similar argument was called "esoteric dialectics" and rejected.
The defendant's admissions before the Law Enforcement Council, read into the record, constituted prima facie proof that he made the telephone call on the town telephone and drove to Binghamton in a town police car. Defendant contends, however, that the corpus delicti of the crime here charged was the unlawful use of the town's telephone and the town-owned automobile, and this the State was obliged to prove by evidence altogether independent of defendant's admissions before the Law Enforcement Council. For this proposition defendant quotes the following from State v. Lucas, 30 N.J. 37, 56 (1959): "the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury * * *."
However, the Lucas case did not deal with the question here involved. In Lucas the court said there are three basic elements in the proof of any crime: first, the occurrence of loss or injury; second "criminal causation of the loss or injury as opposed to accident (i.e., some one committed a crime), and lastly, the defendant's connection with the crime * * *." (at page 53). The court held that the term corpus delicti has reference only to the first of these elements. The question before the court in Lucas was whether to prove the second basic element there had to be proof independent of the confession. The court held that there did not need to be, saying (at page 54) that "if the confession be corroborated by other evidence tending to strengthen it, * * * the criminal agency (as well as defendant's connection with the crime) may be proven by the confession itself." Whether the first "basic element" *25 may be established in the same fashion was not involved in Lucas for that element  the fire and the deaths  had been established by independent evidence.
Lucas did not decide to what extent a confession may be used to establish said first element; or to put it another way, how much evidence wholly independent of the confession is necessary to establish said first element. Prior to Lucas it was well settled in New Jersey that "full proof of the body of the crime is not required in addition to the confession, but sufficient proof thereof may arise out of evidence corroborating some fact or facts in the confession itself * * *." State v. Geltzeiler, 101 N.J.L. 415, 416 (E. & A. 1925); State v. Campisi, 42 N.J. Super. 134, 145 (App. Div. 1956), reversed in part 23 N.J. 513 (1957). It is clear from the discussion in Lucas that in it the Supreme Court did not intend to change the established law. In fact, the court quoted from Professor McCormick as follows (30 N.J., at page 52):
"It is submitted that hard-and-fast rules requiring corroboration are as likely to obstruct the punishment of the guilty as they are to safeguard the innocent." McCormick on Evidence, p. 230, at n. 5 (1954).
The State contends that the testimony before the Law Enforcement Council should be accepted as sufficient to establish the corpus delicti because (a) it was not a confession but merely admissions, and (b) the admissions were in the nature of judicial admissions because defendant had the right to counsel before the Law Enforcement Council, a government agency, and the privilege to refuse to incriminate himself.
We shall assume for the purposes of this opinion, without deciding, that the same rules apply to material admissions as to confessions. Cf. State v. Campisi, supra, 42 N.J. Super., at page 145; Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). The reason a judicial statement of guilt need not be corroborated is because there *26 is presumed to be no possibility of coercion and ample time for advice and reflection. The State urges that admissions before the Law Enforcement Council are of the same trustworthiness, for the same reasons, and hence these admissions should be treated as if they were judicial, requiring no corroboration. There may be merit in the State's position. Cf. Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). However, we prefer not to go that far, but we are of the opinion that the place and circumstances of the making of the admissions are facts which in the case at bar are evidential of their trustworthiness. Parenthetically, it is to be noted that defendant admitted at the trial that he did use the town telephone and automobile at town expense.
The proofs did show that a call was made by defendant to Sergeant Croswell in Binghamton and that defendant went to Binghamton in an automobile with New Jersey registration. The evidence also showed the purpose of the phone call and the trip. We hold that this evidence plus the admissions made before the Law Enforcement Council were sufficient to establish, prima facie, that the call was made on the town telephone, the automobile was one owned by the town, and that they were used by defendant for his own personal and private affairs at public expense. "To ask for more corroboration would be, as indicated by Professor Wigmore, to ask for independent proof of the whole of the charge." State v. Klausner, 4 N.J. Super. 427, 432 (App. Div. 1949).
Defendant contends that to prove that the use of the telephone and the car was contrary to defendant's "public duty," and for his personal affairs not connected with any matter pertinent to his assignment, the State should have proved that he had no right or permission to use the telephone or the car in the manner and for the purposes alleged; and having failed to do so, the motion for acquittal at the end of the State's case should have been granted. We find no merit in this contention. Taking the State's proofs, when *27 the State rested, in their most favorable light, as we must against a motion for acquittal then made, the call and the trip to Binghamton (about 200 miles from West New York) were made for the purpose of improperly influencing the New York State Troopers. That could not possibly have been part of the defendant's assignment or official duties. He could not have been ordered, or even given permission, to use the municipal telephone and automobile for that purpose. Cf. People v. Harby, supra. Even if he went to Binghamton to attempt the improper influence at the behest of the commissioner, the trip could not possibly have been on behalf of the town, as defendant unquestionably must have known. Such an order would have been palpably illegal, and in carrying it out (even as the commissioner's agent) defendant would be upon his personal and private affairs.
Defendant contends that he "suffered manifest injury" by the introduction of certain exhibits, namely, (1) a photograph of Galente, (2) his past record, which showed sentences to the penitentiary, to Sing Sing Prison, and an arrest for murder, and (3) the record of his conviction and sentence upon the motor vehicle violations after defendant's unsuccessful attempt to intercede for him. No. (1) apart from No. (2) is harmless, even if it were erroneous; and (3) we find not prejudicial because it was merely cumulative of what had been testified to orally without objection by Trooper Leibe on direct examination, and by Sergeant Croswell on cross-examination at the insistence of defendant's counsel and over the State's objection.
We hold that it was not error to receive Galente's criminal record in evidence. As we have said, the essential element in the crime here charged was willfulness, as above defined  i.e., that defendant used the town's telephone and automobile for such a gross departure from public business that, beyond a reasonable doubt, he could not have believed, even mistakenly, that his use of the public property was within the boundaries of an express or implied permission, *28 or a minor, customary or otherwise forgiveable deviation. In short, the State was required to prove the complete absence of good faith beyond a reasonable doubt.
This the State undertook to do by proving (a) that defendant went to Binghamton to intercede for Galente, and (b) that he offered the New York officers a bribe. Against the possibility that defendant would say that he had gone to Binghamton on a harmless, good samaritan errand to help an unknown unfortunate friend of the commissioner, the State had the right to prove that after defendant was shown Galente's record, and after defendant himself called Galente a "bum," defendant persisted in his efforts on Galente's behalf. The persistence of defendant, a police captain, after having seen the record, tended to show that Galente's record was in fact no surprise to defendant and that defendant did not leave West New York to help a reputable friend of the commissioner at the latter's request, or that he thought in good faith that it was all right to use the town's car and telephone for that purpose. It is most unusual for one to expect a jail sentence for a motor vehicle violation unless he already has a bad record. The evidence of Galente's record, plus defendant's attempt to keep him out of jail, tended to establish that the defendant left West New York with the willful, evil intent to use a town vehicle for his own personal and private affairs, namely, to drive a long distance to improperly influence New York officers on behalf of a known criminal.
Finally, defendant argues that it was error to permit the State to call Policastro as a rebuttal witness, and that the error became prejudicial when Policastro refused to testify on the ground that he was under indictment himself for his part in this trip and his answers might tend to incriminate him.
Permission to call a witness on rebuttal is within the trial court's discretion and will not lead to reversal unless the exercise of that discretion was manifestly erroneous and prejudicial State v. DeRocco, 53 N.J. Super. 316 (App. *29 Div. 1959). We perceive no such situation here. Policastro appeared to have been a confederate of defendant and the State had every reason to believe defendant would call him as a witness. There was much of the story that defendant told on the witness stand in his own behalf  an incredible one, we may add  that Policastro could have rebutted, if Gleitsmann's testimony was false. The State therefore had reason not to call Policastro on its main case, and the trial judge was justified in permitting the State to call him in rebuttal.
There is nothing in the record to show that the State called Policastro knowing that he would refuse to testify on the ground of self-incrimination, hoping thus to prejudice defendant. When Policastro did refuse to testify, there was no request for a mistrial or for any instructions to the jury to negative any adverse effect of this episode. Defendant insists, however, that this was plain error. We do not agree. State v. Haines, 18 N.J. 550 (1955).
Affirmed.